## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

JOSEPH FARYNIARZ,

                Plaintiff,

  v.

JOSE E. RAMIREZ, JR CHEM, LLC, JR
CHEMICAL, INC., and OBAGI MEDICAL
PRODUCTS, INC.

              Defendants.

3:13-CV-01064 (CSH)

**November 9, 2015**

### RULING ON PLAINTIFF'S SECOND MOTION TO AMEND THE COMPLAINT

**HAIGHT,** Senior District Judge:

Anyone who read the Court's prior decision in this case, reported at *Faryniarz v. Ramirez*, 62 F. Supp. 3d 240 (D. Conn. 2014) ("the December 2014 Ruling"), might feel a sense of déjà vu this second time around. The subject of this Ruling, Plaintiff's proposed seconded amendment complaint, reasserts federal patent infringement, 35 U.S.C. § 271, and Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1962 and 1964, claims based on allegations that are materially identical to those pleaded in the first proposed amended complaint and recited in the Court's December 2014 Ruling dismissing that proposed pleading with leave to amend.

### I

Plaintiff Joseph Faryniarz, a resident of Middlebury, Connecticut, seeks leave to file his seconded amended complaint and assert federal patent, RICO, and state statutory and common law claims against defendants Jose E. Ramirez, JR Chem, LLC, JR Chemical, Inc. and Obagi Medical Products, Inc. JR Chemical, Inc., and Obagi Medical Products, Inc. have not filed appearances in this action; however, Defendants Jose E. Ramirez and JR Chem, LLC (collectively, "Defendants")

oppose the instant motion and seek dismissal of this action with prejudice to Plaintiff's right to replead. The motion is ripe for adjudication. This Ruling decides it.

## II

On August 1, 2013, the Court heard oral argument and received testimony concerning whether the common law and state statutory claims asserted in the original complaint, [Doc. 1], implicated this federal district court's subject matter jurisdiction pursuant to 28 U.S.C. § 1332. Concluding "that Plaintiff failed to establish with the requisite degree of certitude that complete diversity of citizenship exists between the parties," the Court dismissed the complaint for lack of subject matter jurisdiction without prejudice to Plaintiff's right to reassert those claims in a court of competent jurisdiction. Doc. 13, at 1. In accordance with that Order, the Clerk entered judgment dismissing this case on August 5, 2013. Doc. 16.

Plaintiff subsequently filed a motion for leave to amend the complaint, alleging "violations of federal law making diversity [of citizenship] moot and jurisdiction proper in this court." Doc. 18, at 1. Specifically, the proposed amended complaint asserted civil RICO, 18 U.S.C. §§ 1962 and 1964, and patent infringement violations, 35 U.S.C. § 271, as the bases for this Court's subject matter jurisdiction. In the December 2014 Ruling, I concluded that it would be futile to allow the proposed amendments since they failed to sufficiently allege either a RICO claim or a patent infringement claim, and the Court lacked subject matter jurisdiction over the non-federal claims. Accordingly I denied Plaintiff's motion to amend the complaint without prejudice to refiling.

On January 6, 2015, Plaintiff filed the instant motion to amend the complaint and a proposed second amend complaint, which purports to address the pleading deficiencies identified in the Court's December 2014 Ruling. The proposed second amended complaint ("SAC") is the subject

of this Ruling.

### III

The following facts are derived from Plaintiff's allegations in the SAC, Doc. 28-1. Those allegations, to the extent that they are well-pleaded and not conclusory, are accepted as true for the purposes of this disposition, so that the viability of Plaintiff's proposed claims may be discerned under the governing law. The Court also relies on two exhibits appended to the SAC: Exhibit A, which purports to be a written contract between Plaintiff and Ramirez, dated October 6, 2006, and Exhibit B, which purports to be a schedule of chemical compounds invented by Plaintiff and misappropriated by Ramirez. *See Subaru Distribs. Corp. v. Subaru of Am., Inc.*, 425 F.3d 119, 122 (2d Cir. 2005) ("In determining the adequacy of the complaint, the court may consider any written instrument attached to the complaint as an exhibit or incorporated in the complaint by reference, as well as documents upon which the complaint relies and which are integral to the complaint."); *New York Life Ins. Co. v. United States,* 724 F.3d 256, 258 (2d Cir. 2013) (citing same).

Plaintiff Joseph Faryniarz and Defendant Jose E. Ramirez are chemists. They met and developed a friendship during the course of their employment at Chesebrough-Ponds in Trumbull, Connecticut, before its merger with Unilever. Doc. 28-1, at ¶16. Sometime in or around 2003, Ramirez left Unilever to form his own business venture, JR Chem, LLC, to develop chemical compositions and license those chemical technologies to cosmetic and pharmaceutical companies. *Id.* at ¶ 19. In the late 2003 early 2004 time frame, Plaintiff, upon Ramirez's invitation, agreed to take an early retirement from Unilever and join him as an equal partner in that endeavor. *Id.* at ¶¶ 20-21. Pursuant to their agreement, Ramirez would handle the administrative and business related tasks associated with the venture, which notably included applying for patents and negotiating with

3

potential licensees, including defendant Obagi Medical Products, Inc. ("Obagi").  Plaintiff, for his part, would run the venture's lab, which was located in Milford, Connecticut, and assume primary responsibility for developing the patentable chemical technologies.  *Id.* at ¶ 20.  Although Ramirez and Plaintiff were equal partners in the venture, they agreed that Plaintiff would work as a consultant for JR Chem, LLC, whose sole member was Ramirez, and that the royalties from licensing agreements would be paid directly to JR Chem, LLC.  *Id.* at ¶¶ 7, 22.

By late 2004, Plaintiff had made enough progress developing promising chemical technologies, that Ramirez, through JR Chem, LLC, was able to secure a five year development contract with Obagi, which was to commence on January 1, 2005.  Doc. 28-1, at ¶ 24.  The agreement provided that Obagi would pay a royalty based on the sale proceeds of the licensed technology to JR Chem, LLC, and that Plaintiff and Ramirez would be paid through JR Chem, LLC. *Id.*

In or about March 2006, Ramirez began to prepare and file patent applications with the United States Patent and Trademark Office ("USPTO") for chemical technologies invented principally by Plaintiff.  *Id.* at  ¶ 26.  Around this time, Plaintiff requested to reduce to writing his agreement with Ramirez to share equally the profits of their business venture.  *Id.* at ¶ 27.

On October 6, 2006, Plaintiff, on behalf of Joseph Faryniarz LLC, and Ramirez, on behalf of JR Chem, LLC, signed a  written contract.  Doc. 28-2, [Ex. A].  The contract, which I refer to in this Ruling as the "October 2006 Contract," listed nine chemical technologies, the "invention" of which Plaintiff "contributed to," and stated that "[a]s part of compensation for his services, JR Chem., LLC will share in equal parts any royalties and licensing fees for these patents with Joseph Faryniarz LLC." *Id.*; *see also* Doc. 28-1, at ¶ 36.  At the time Plaintiff and Ramirez signed the

October 2006 Contract, patent applications for the nine chemical technologies were pending before the USPTO.

Although not reduced to writing, Ramirez also assured Plaintiff that both he and Plaintiff would be listed as co-inventors on all patent application filed with the USPTO, but that "to ensure the equivalency of ownership in any inventions and to recognize their joint efforts," he would alternate the first-named inventor when filing applications with the USPTO. *Id.*, at ¶ 29. Throughout this Ruling, I refer to Plaintiff's and Ramirez's oral agreement to alternate the first-named inventor on patent applications as the "Naming Agreement."

Apart from the October 2006 Contract and the Naming Agreement, Plaintiff and Ramirez entered into a separate oral agreement to share equally the proceeds of a raw material manufactured by the venture called Cu/Zn malonate, a chemical technology developed principally by Plaintiff. *Id.*, at ¶ 35. The Cu/Zn malonate raw material supported Obagi's "Elastiderm" product line. *Id.* I refer to this oral agreement between Plaintiff and Ramirez to share equally in the proceeds of the Cu/Zn malonate raw material as the "Raw Material Agreement."

The relationship between Plaintiff and Ramirez began to break down irreparably sometime in 2008 when Plaintiff discovered that Ramirez had not been strictly adhering to the Naming Agreement. When Plaintiff confronted Ramirez about his failure to honor the Naming Agreement, Ramirez initially told Plaintiff "that it did not matter since Plaintiff was getting paid." *Id.*, at ¶ 38. Later, Ramirez agreed to correct the inventor names on the patent applications, but in spite of that promise, has not made corrective filings with USPTO to date. *Id.*

By 2009, Plaintiff noticed that Ramirez was becoming increasingly secretive about the venture's business dealings and was sharing less and less information with Plaintiff. *Id.*, at ¶ 39. In

October 2010, with the business venture's development contract with Obagi drawing to a close, Ramirez informed Plaintiff that his negotiations to renew the contract had been unsuccessful.  *Id.* at ¶ 43.  Not long thereafter, Plaintiff stopped receiving his share of the Obagi royalty payments even though JR Chem, LLC continued to receive payments from Obagi through the third quarter of 2012. *Id.* at ¶¶ 44-46.

The business relationship between Plaintiff and Ramirez was further complicated by the matter of patent ownership.  At the inception of the venture's development contract with Obagi, Ramirez represented to Plaintiff that "in order to ensure that they received payment from . . . Obagi, it was necessary" for Plaintiff to assign to JR Chem, LLC "his entire right, title and interest in or to each of the inventions he developed, since JR Chem, LLC was party to the contract with Obagi." *Id.* at ¶ 28.  In light of Ramirez's representation, "[f]or all patent applications that were made . . . Plaintiff executed documents presented to him by . . . Ramirez purporting to assign his interest in all of these patentable technologies."  *Id.* at ¶ 37; *see also id.* at ¶ 30.

The USPTO granted Ramirez's patent applications and issued patents for eleven of those chemical technologies.  *Id.*, at   ¶ 50.  Twenty-nine other patent applications for chemical technologies, filed by Ramirez, were also pending before the USPTO when the SAC was filed.  In twenty-three of them, Plaintiff and Ramirez share credit as co-inventors.  In the remaining six, Ramirez designated himself the sole inventor.  *Id.*, at  ¶¶ 47, 50; Doc. 28-2 [Ex. B].

On or about November 1, 2013, shortly after the original complaint was filed on July 26, 2013, Ramirez, acting on behalf of JR Chem, LLC, purported to reassign to Obagi the eleven patented inventions Plaintiff had developed.  *Id.* at ¶ 48.

The SAC seeks a declaratory judgment that Plaintiff is the owner and inventor of the eleven

issued patents (counts 1-11) and other chemical technologies for which Ramirez has filed patent applications, which include the twenty-three applications that designate Plaintiff as a co-inventor (count 23) and the six applications that designate Ramirez as the sole inventor (count 24). The SAC also asserts claims for patent infringement of the eleven issued patents in violation of 35 U.S.C. § 271(a) against Obagi, and claims for infringement by inducement in violation of 35 U.S.C. § 271(b) against Ramirez (counts 12 - 22). In addition, the SAC asserts a RICO claim, 18 U.S.C. §§ 1962(c) and 1964, (count 25), and claims to commit RICO conspiracy, 18 U.S.C. 1962(d), (counts 26-27), against Ramirez. The balance of the SAC asserts common law or state statutory claims against Ramirez, JR Chem, LLC and JR Chemical, Inc.[1] (counts 28 - 36).

## IV

Rule 15(a)(2) of the Federal Rules of Civil Procedure states that "a party may amend its pleading only with the opposing party's written consent or the court's leave," and that "[t]he court should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2). "Whether leave should be granted is entrusted to the district court's discretion, which cannot be regarded as entirely unfettered, since the last sentence of Rule 15(a)(2) contains a pointed instruction, reflective of the procedural rules' ultimate objective that justice be done." *Gustovich v. Town of Greenwich*, No. 3:14 CV 01242 (CSH), 2015 WL 5251930, at *3 (D. Conn. Sept. 8, 2015) (internal quotation marks and citations omitted). "In the absence of any apparent or declared reason — such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the

---

[1] According to the SAC, JR Chemical is alleged to be the "successor in interest" to JR Chem, LLC and other limited liability companies affiliated with Ramirez. Doc. 28-1, at ¶ 8.

amendment, futility of the amendment, etc. — the leave sought [to amend] should, as the rules require, be 'freely given.'" *Foman v. Davis*, 371 U.S. 178, 182 (1962). *See also Milanese v. Rust-Oleum Corp.*, 244 F.3d 104, 110 (2d Cir. 2001) ("Leave to file an amended complaint 'shall be freely given when justice so requires,' Fed. R. Civ.P. 15(a), and should not be denied unless there is evidence of undue delay, bad faith, undue prejudice to the non-movant, or futility.").

Defendants oppose the motion to amend the complaint on grounds that the federal claims Plaintiff seeks to assert are not viable as a matter of law so that the amendments would be futile and the Court is without subject matter jurisdiction over the remaining common law and state statutory claims. It is well established that "leave to amend a complaint may be denied when amendment would be futile." *Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014) (quoting *Tocker v. Philip Morris Cos.*, 470 F.3d 481, 491 (2d Cir. 2006)).  "An amendment to a pleading is futile if the proposed claim could not withstand a motion to dismiss pursuant to [Rule] 12(b)(6)." *Garay v. Novartis Pharmaceuticals Corp.*, 576 F.App'x 24, 25 (2d Cir. 2014) (quoting *Lucente v. Int'l Bus. Machs. Corp.*, 310 F.3d 243, 258 (2d Cir. 2002)). *See also Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir. 2000) (finding  leave to replead would be futile where the complaint, even when read liberally, did not "suggest [ ] that the plaintiff has a claim that she has inadequately or inartfully pleaded and that she should therefore be given a chance to reframe"); *Ricciuti v. N.Y.C. Transit Auth.*, 941 F.2d 119, 123 (2d Cir.1991) ("When the plaintiff has submitted a proposed amended complaint, the district judge may review that pleading for adequacy and need not allow its filing if it does not state a claim upon which relief can be granted.").

The Supreme Court has laid down in two cases guidelines to determine whether the factual allegations of a complaint are sufficient in content and form to survive a motion to dismiss.  Those

cases are *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) ("*Twombly*") and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ("*Iqbal*").

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim that is plausible on its face.'" *Iqbal*, 566 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). This pleading standard creates a "two-pronged approach," *Iqbal*, 556 U.S. at 679, based on "[t]wo working principles, " *id*. at 678.

First, although a complaint need not include detailed factual allegations, it must provide "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678. "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Id*. (quoting *Twombly*, 550 U.S. at 555). "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Id.* (quoting *Twombly*, 550 U.S. at 557. "Although for the purposes of a motion to dismiss we must take all of the factual allegations in the complaint as true, we 'are not bound to accept as true a legal conclusion couched as a factual allegation.'" *Id*. (quoting *Twombly*, 550 U.S. at 555. "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Id*. at 679.

Second, "[w]hen there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Iqbal*, 556 U.S. at 679. This 'facial plausibility" prong requires the plaintiff to plead facts "allow[ing] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. at 678. Importantly, the complaint must demonstrate "more that a sheer possibility that a defendant has acted unlawfully." *Id*. "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged but it has not 'show[n]' – 'that the pleader is

entitled to relief.'"  *Id.* at 679 (quoting Fed.R.Civ.P. 8(a)(2)).  "Determining whether a complaint

states a plausible claim for relief [is] . . . a context-specific task that requires the reviewing court to

draw on its judicial experience and common sense."  *Id.*[2]

**V**

A.      **RICO Claims**

    1.      **Additional Background as Pleaded by Plaintiff**

The SAC realleges claims or "substantive racketeering" in violation of 18 U.S.C. §§ 1962(c)

and 1964 (count 25), and conspiracy to violate RICO, 18 U.S.C. §§ 1962(d), by means of mail fraud

(count 26) and wire fraud (count 27).

The SAC alleges that Ramirez, JR Chem, LLC, JR Chemical, Inc., and members of Ramirez's

family, namely his wife, son, daughter, and daughter-in-law, formed the "Ramirez Enterprise."  Doc.

28-1, at ¶ 252.  The Ramirez enterprise, the SAC alleges, "constituted an 'enterprise' as defined in

Title 18, United States Code, § 1961(4)," [Doc. 28-1, at ¶ 253], "whose members and associates

collaborated for the purpose of wrongfully and unlawfully acquiring intellectual property in the form

of inventions, as well as the proceeds generated therefrom."  *Id.*, at ¶ 254; *see also id.*, at ¶ 255.  The

unlawful acquisition of patents was accomplished through the enterprise's "means and method," *id.*,

at p. 48 (bold, underline, and caps omitted), which principally, if not exclusively, encompassed

Ramirez's scheme to defraud Plaintiff by first "procur[ing] [his] confidence and trust," *id.,* at ¶ 256,

and "creat[ing] the illusion of friendship," *id.,* at ¶ 257.

_____

[2] The foregoing summary of the *Twombly/Iqbal* pleading standards is adopted from the
Second Circuit's opinion in *Pension Benefit Guaranty Corp. ex rel. Saint Vincent Catholic Medical
Centers  Retirement Plan v. Morgan Stanley Investment Management Inc.*, 712 F.3d 705, 717-718
(2d Cir. 2013).

10

The specific acts or communications that the SAC attributes to Ramirez and allege as fraud are discussed in greater detail, *infra*.

### 2. **RICO Enterprise**

Before turning to the SAC's specific allegations of fraud, the Court considers whether the SAC alleges a RICO enterprise.  A RICO enterprise "includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."  18 U.S.C. § 1961(4).  "For an association of individuals to constitute an enterprise, the individuals must share a common purpose to engage in a particular fraudulent course of conduct and work together to achieve such purposes." *Cruz v. FXDirectDealer, LLC*, 720 F.3d 115, 120 (2d Cir. 2013) (citations omitted).

The SAC alleges that the "Ramirez Enterprise" is "a group of individuals associated in fact." Doc. 18-1, at ¶ 253.  An "association-in-fact" enterprise must have at least three structural features: (1) a purpose, (2) relationships among those associated with the enterprise, and (3) longevity sufficient to permit these associates to pursue the enterprise's purpose. *Boyle v. United States*, 556 U.S. 938, 946 (2009).  To determine whether a group of individuals or entities constitute an association-in-fact, courts in this Circuit analyze the "hierarchy, organization, and activities" of the alleged association to determine whether "its members functioned as a unit." *First Capital Asset Mgmt. v. Satinwood, Inc.*, 385 F.3d 159, 174-75 (2d Cir. 2004); *Cont'l Petroleum Corp. v. Corp. Funding Partners, LLC*, No. 11 CIV 7801 (PAE), 2012 WL 1231775, at *5 (S.D.N.Y. Apr. 12, 2012) (citing same).  The "concept of association requires both interpersonal relationships and a common interest" as well as evidence that the "group . . . function[s] as a continuing unit." *Id.* (internal quotation marks and citations omitted).

11

The SAC does not provide well-pleaded information regarding the Ramirez Enterprise's structural features.  It does not define the respective roles of each member of the Ramirez Enterprise. In fact, every instance of fraud alleged in the SAC is attributed to Ramirez himself, or to a much lesser extent, the Ramirez Enterprise as a whole.  Absent information regarding the individual role of each member of the enterprise, the SAC's allegation that the "purpose" of the enterprise is to "wrongfully and unlawfully acquir[e] intellectual property in the form of inventions" is wholly conclusory. Doc. 28-1, at ¶ 254; *see BWP Media USA Inc. v. Hollywood Fan Sites, LLC*, 69 F. Supp. 3d 342, 360 (S.D.N.Y. 2014) (observing that there was no "information from which it could be concluded that Defendants function as a unit or that they shared a common purpose, in the absence of any mention of the roles each Defendant played and the actions they took"); *Cont'l Petroleum*, 2012 WL 1231775, at *6 ("The Amended Complaint's failure to plead with any specificity as to the nature of the defendants' common interests and the mechanics of the alleged ongoing working relationship among defendants is fatal.").

Moreover, the SAC does not contain information regarding the "relationships among those associated with the enterprise," *Boyle v. United States*, 556 U.S. at 946, such as "agreements or mutual expectations of reciprocal behavior," *In re Trilegiant Corp., Inc.,* No. 3:12cv00396 VLB, 2014 WL 1315244 (D. Conn. Mar. 28, 2014), indicative of a group of individuals working together to achieve a common goal.  *See First Capital Asset Mgmt. v. Satinwood, Inc.*, 385 F.3d 159, at 175 (stating that "Plaintiffs' conclusory naming of a string of entities does not adequately allege an enterprise" (international quotation marks and citations omitted)).

Finally, there is no information about when Ramirez's wife, son, daughter, and daughter-law became associated with the "Ramirez Enterprise," and thus no basis from which to infer they were

even engaged in the operations of the "Ramirez Enterprise" when Ramirez committed the instance of fraud featured most prominently in the complaint: Ramirez's representation to Plaintiff that it was necessary for Plaintiff to assign his interest in patentable technologies to JR, Chem, LLC, in order for the business venture to receive payment from Obagi.  If anything, the fact that these family members are identified in the SAC as officers of JR Chemical, Inc. — Jr Chem, LLC's, *successor* in interest — suggests that they had no involvement in an earlier alleged scheme to defraud Plaintiff. In short, apart from allegations pertaining to Ramirez himself, there is virtually no information in the SAC about what the other alleged members of the "Ramirez Enterprise" did to defraud Plaintiff, when they defrauded him, and how they did it.

The Court therefore concludes that the SAC fails to allege a RICO claim because it does not allege a criminal RICO enterprise.  *See D. Penguin Bros. v. City Nat'l Bank*, Nos. 13 Civ. 41 (TPG), 13 Civ. 706 (TPG), 2014 WL 982859, at *4 (S.D.N.Y. Mar. 11, 2014), *aff'd,* No. 14-1056-cv, 587 Fed. Appx. 663, 2014 WL 5293242 (2d Cir. Oct. 16, 2014) (stating that there can be no RICO violation without a RICO enterprise).  In the case at bar, the individuals to which the SAC refers, other than Defendant Jose Ramirez, are described solely with respect to their relationship to him: wife, son, daughter, or daughter-in-law.  The SAC alleges the existence of a marital enterprise and a broader familial enterprise, but these happy, loving and supportive domestic relationships are not the darker stuff of which a criminal RICO enterprise is made.

### 3. RICO Elements and the Predicate Acts of Mail and Wire Fraud

Plaintiff's RICO claim also fail because the SAC does not state a single instance of mail or wire fraud, much less a pattern of racketeering activity.

Section 1964(c) provides a private right of action to "[a]ny person injured in his business or

property by reason of violation of [Title 18,] section 1962" of the United States Code.  18 U.S.C. § 1964(c).  Section 1962(c) makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity."  18 U.S.C. § 1962(c).

To state a substantive RICO claim pursuant to 18 U.S.C. § 1962(c), a plaintiff must adequately allege: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Sedima, S.P.R.L v. Imrex Co.*, 473 U.S. 479, 496 (1985).  A RICO pattern of racketeering activity "must consist of two or more predicate acts of racketeering."  *Lundy v. Catholic Health Sys. of Long Island, Inc.*, 711 F.3d 106, 119 (2d Cir. 2013).  The list of predicate activities includes mail fraud and wire fraud, the predicate acts alleged by Plaintiff at bar.  18 U.S.C. § 1961(1).  The elements of mail or wire fraud include "(1) the existence of a scheme to defraud, (2) the defendant's knowing participation in the scheme, and (3) the use of wire [or] mail . . . communications in interstate commerce in furtherance of the scheme."  *Chanayil v. Gulati*, 169 F.3d 168, 170-71 (2d Cir. 1999); *see also United States v. Corey*, 566 F.2d 429, 431 (2d Cir. 1977).

A plaintiff has a high burden when pleading RICO allegations.  Where as here, the SAC sounds in the predicate acts of mail and wire fraud, the conduct of the defendant that allegedly constitutes fraud must be pleaded with particularity under Rule 9(b) of the Federal Rules of Civil Procedure.  *See Curtis v. Law Office of David m. Bushman, Esq.*, 443 F. App'x 582, 584 (2d Cir. 2011) ("[A]ll allegations of fraudulent predicate acts[] are subject to the heightened pleading requirements of Federal Rule of Civil Procedure 9(b)."); *Spiteri v. Russo*, No. 12 cv 2780 (MKB) (RLM), 2013 WL 4806960, at *49 (E.D.N.Y. Sept. 7, 2013) (citing same).  Thus, allegations of

predicate mail and wire acts should (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent. *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993) (citing *Cosmas v. Hassett*, 886 F.2d 8, 11 (2d Cir. 1989)); *see Spool v. World Child Int'l Adoption Agency*, 520 F.3d 178, 185 (2d Cir. 2008). "Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally," Fed. R. Civ. P. 9(b); however, a complaint "must nonetheless allege facts which give rise to a strong inference that the defendants possessed the requisite fraudulent intent." *Cosmas v. Hassett*, 886 F.2d at 12-13 (citing *Beck v. Manufacturers Hanover Trust Co.*, 820 F.2d 46, 50 (2d Cir. 1987), *cert. denied*, 484 U.S. 1005 (1988), *overruled on other grounds*, *United States v. Indelicato*, 865 F.2d 1370 (2d Cir. 1989) (en banc) ("In general, the mail and wire fraud statutes require, *inter alia*, a showing of intentional fraud.")).

Furthermore, a pattern of racketeering "must be adequately alleged in the complaint" in order to state a RICO claim. *Spool,* 520 F.3d at 183 (alternation omitted) (citations and internal quotation marks omitted). As this Court stated in its prior Ruling, "[a]llegations merit particular scrutiny where the predicate acts are mail and wire fraud, and where the use of mail or wires to communicate is not in and of itself illegal, unlike other predicate acts such as murder or extortion." *Faryniarz v. Ramirez*, 62 F. Supp. 3d at 252 (citations omitted); *see also Rosenson v. Mordowitz*, No. 11 Civ. 6145 (JPO), 2012 WL 3631308, at *5 (S.D.N.Y. Aug. 23, 2012) (cautioning plaintiffs' against "mold[ing] their claims to the RICO form even though their injuries do not fall within those intended to be addressed by the Act"). "Additionally, the statement upon which the fraud claim is predicated must be something more than a false promise by a party to a contract that he will fulfill the terms of the agreement." *Lefkowitz v. Reissman*, No. 12 cv 8703 (RA), 2014 WL 925410, at *4 (S.D.N.Y.

15

Mar. 7, 2014) (citing *Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc.*, 98 F.3d 13, 19-20

(2d Cir. 1996)).  "The cases are legion that a RICO complaint [based on wire fraud] cannot be

predicated on innocuous business communications, absent some factual basis for inferring the

sender's intent to defraud the recipient via a scheme to defraud."  *Cont'l Kraft Corp. v. Euro-Asia*

*Dev. Grp., Inc.,* No. 97-CV-0619, 1997 WL 642350, at *5 (E.D.N.Y. Sept. 8, 2007).

      The section of the SAC, captioned "**The Fraud**," [Doc., 28-1, at 16 (emphasis in original)],

describes the principal instance of fraud allegedly perpetrated on Plaintiff by Ramirez:

> 49.  Defendant Ramirez held himself out to the plaintiff to be an expert in how to organize businesses, particularly chemical-related businesses, and to be well-versed in the ways to handle intellectual property rights . . . .

> 50.  Defendant Ramirez claiming the expertise above, made false representations as statements of fact in order to deprive the plaintiff of all his right, title and interest in . . . patented inventions and . . . other inventions for which patents have been applied . . . .

> 51.  Defendant Ramirez's false representations as statement of fact included, but were not limited to, that it was necessary for the plaintiff to execute assignments granting the plaintiff's entire right, title and interest in and to his inventions to JR Chem, LLC -- a company solely owned and controlled by Ramirez-- in order for the plaintiff to receive fifty-percent (50%) of the net royalties and licensing fees for the inventions since JR Chem, LLC had a contract with Obagi concerning the inventions.  These representations were untrue and known to be untrue by Defendant Ramirez at all times.

> 52.  Defendant Ramirez's knowingly false representations were specifically intended to induce the plaintiff to act upon them.

> 53. Plaintiff did so act upon Ramirez's false representations to his injury.

Doc. 28-1, at ¶¶ 49-53.  The crux of the allegation of fraud is found in paragraph 51 where the SAC

alleges that Ramirez represented to Plaintiff that he was required to assign his intellectual property

rights in patentable chemical technologies to JR Chem, LLC in order for JR Chem, LLC to receive payment from Obagi.  That reoccurring allegation runs throughout the SAC, including at paragraph 28 where Plaintiff alleges:

> Defendant Ramirez represented to Plaintiff that in order to ensure that they received payment from Defendant Obgai, it was necessary that the plaintiff execute paperwork assigning to JR CHEM, LLC his entire right, title, and interest in or to each of the inventions he developed, since JR Chem, LLC was a party to the contract with Obagi, and it was through that entity which they would receive revenue.

Doc. 28-1, at ¶ 28; *see also id.* at ¶¶ 50-51, 67, 77, 86, 95, 104, 113, 121, 131,140, 259.  Though stated over and over again, the SAC does not allege, as required under Rule 9(b), where this statement was made, when it was made, or how and in what respects it is fraudulent.  In that latter regard, there is nothing in the SAC which supports the inference that Ramirez knew the assignment of intellectual property rights to JR Chem, LLC by Plaintiff was not required in order for JR Chem, LLC to receive payment from Obagi.  As such, it is a conclusory allegation that will not be credited by the Court.  *Cf. Spiteri v. Russo*, No. 12 cv 2780 (MKB) (RLM), 2013 WL 4806960, at *49 (E.D.N.Y. Sept. 7, 2013) (collecting cases for the proposition that dismissal of RICO claim is warranted where complaint fails to meet Rule 9(b) pleading requirements).  Moreover, even if this recurring allegation did past muster under Rule 9(b), it would not support a claim for mail or wire fraud because it is not accompanied by allegations that Ramirez transmitted this statement by means of mail or wire, or, as discussed *infra*, plausible allegations that certain mailing or wire transmissions were "incident to an essential part of the scheme or a step in the plot." *Schmuck v. United States*, 489 U.S. 705, 710-11 (1989).

In regard to the mailing and wire element of the alleged mail and wire fraud, the SAC alleges:

> Defendant Ramirez caused to be mailed [and wired] by defendant
> Obagi checks for royalties and/or licensing fees payable to JR Chem,
> LLC, directly related to the inventions at issue, portions of the funds
> from which were paid to the plaintiff in order to convince plaintiff
> that all was as it was being represented and to keep plaintiff working
> developing inventions that Defendant Ramirez also planned to, and
> did convert to his sole control . . .

Doc. 28-1, at ¶ 263; *see also id.* at ¶ 264.   The SAC then lists the dates and check numbers of

discrete royalty payments Obagi made by mail and wire to JR Chem, LLC, or JR Chemical, Inc. *Id.*

at ¶¶ 263, 264.   Thus, the SAC alleges that Ramirez defrauded Plaintiff by representing that Plaintiff

was required to assigned his intellectual property rights to JR Chem, LLC in order for the latter to

receive payment from Obagi, and that *after* the fraud was completed — that is, after, Ramirez made

that fraudulent misrepresentation and Plaintiff assigned his intellectually property rights to JR Chem,

LLC — JR Chem, LLC received royalty payments from Obagi through checks sent in the mail or

payments made by wire transmission.

"'The federal mail fraud statute does not purport to reach all frauds, but only those limited

instances in which the use of the mails is part of the execution of the fraud, leaving all other cases

to be dealt with by appropriate state law.'" *Schmuck v. United States,* 489 U.S. at 710 (citing *Kann*

*v. United States*, 323 U.S. 88, 95 (1944)).   "To be part of the execution of the fraud, however, the

use of the mails need not be an essential element of the scheme." *Id.* (citing *Pereira v. United States*,

347 U.S. 1, 8 (1954).   "It is sufficient for the mailing to be incident to an essential part of the scheme

. . . or a step in the plot." *Id.* (brackets, citations, and internal quotation marks omitted).

In a series of decisions the Supreme Court held that certain post-fraud communications were

not "for the purpose of executing [a] scheme or artifice" to defraud as the phrase is defined in the

mail fraud statute.   18 U.S.C. § 1341; *see also* 18 U.S.C. § 1343.   In *Kann v. United States*, 323 U.S.

18

88 (1944), the defendants were charged with mail fraud after the paying banks mailed the checks to the drawee banks for recoupment. *Id.* at 90-92. The court held that the interbank mailings were not in furtherance of defendants' fraudulent scheme, reasoning that the "scheme . . . had reached fruition" when the "persons intended to receive the money had received it irrevocably" and that "[i]t was immaterial . . . how the bank which paid or credited the check would collect from the drawee bank." *Id.* at 94.

Later, in *Parr v. United States*, 363 U.S. 370 (1960), the court relied on its reasoning in *Kann* to conclude that mail fraud liability did not lie against defendants, who fraudulently used a school district's credit card to purchase gasoline, merely because the gasoline vendor mailed invoices for the purchases to the school district and the school district mailed payment. *Id.* at 393. Like in *Kann*, the Court reasoned that defendants' scheme in *Parr* "had reached fruition when [they] received the goods and services complained of," and that "[it] was immaterial to them or to any consummation of the scheme, how the [gasoline vendor] would collect from the [school district]." *Id.* (internal quotation marks and citation omitted).

Similarly, in *United States v. Maze*, 414 U.S. 395 (1974), the court held that a defendant who had used a stolen credit card at a motel could not be convicted of mail fraud simply because the motel had forwarded the bill to the card owner for payment. The court reasoned that defendant's "scheme reached fruition when he checked out of the motel, and [that] there [was] no indication that the success of his scheme depended in any way on which of his victims ultimately bore the loss." *Id.* at 402.

In the case at bar, Ramirez's alleged "scheme to defraud" Plaintiff was completed when Plaintiff assigned his intellectual property rights to JR Chem, LLC. The allegation that JR Chem,

LLC was subsequently paid by Obagi by way of mail and wire is immaterial and unrelated to the so-called fraud and was therefore not an "essential element of the scheme" to defraud Plaintiff.  Indeed, the alleged fraud could just have easily been accomplished had an Obagi representative hand delivered cash payments to Ramirez, who then in turn hand delivered cash payments to Plaintiff. Thus, even if the SAC alleged that Ramirez defrauded Plaintiff with the degree of particularity required by Rule 9(b), it would fail for the additional reason that it does not plausibly allege that the mail or wires were used "for the purpose of executing [a] scheme" to defraud within the meaning of that phrase as it used in the mail and wire fraud statutes. 18 U.S.C. §§ 1341 and 1343.

Apart from the SAC's reoccurring allegation that Ramirez defrauded Plaintiff by representing that payment from Obagi required Plaintiff to assign his intellectual property rights to JR Chem, LLC, the SAC alleges that Ramirez committed these three additional acts of wire and mail fraud at paragraph 266:

> a. On Nov 11, 2010 JR[3] emailed plaintiff misrepresenting that he was in negotiations with Obagi to support JR's story that the Obagi royalties had been lost, when in fact JR was simply not paying the plaintiff his fair share.

> b. On December 21, 2010, JR emailed plaintiff making numerous false claims in order to dissuade the plaintiff from asserting his rights, to wit, falsely claiming that JR was upset with the plaintiff because the plaintiff had made statement [*sic*] that had "destabilized" Ramirez's company, and falsely claiming that the plaintiff owed JR money for over payments of royalties.

> c. On January 27, 2011, [Ramirez] caused to be mailed and emailed a letter from Attorney Santalesa falsely claiming plaintiff owed JR monies for JR's litigation with his former business partner in an effort to further the fraud and to dissuade the plaintiff from asserting his rights.

---

[3]The SAC's references to "JR" presumably refer to Defendant Jose E. Ramirez.

Doc. 28-1, at ¶ 266.  These allegations are insufficient as a matter of law to support a claim for fraud.

Even if they satisfy the heightened pleading requirements of Rule 9(b) — a dubious proposition in

light of the fact that the SAC does not explain why each of these statements are fraudulent and how

they are in furtherance of the alleged RICO scheme — the SAC does not allege how these alleged

misrepresentations were intended to cause Plaintiff injury.  *See UFCW Local 1776 v. Eli Lilly & Co.*,

620 F.3d 121, 132 (2d Cir. 2010) (explaining that to show injury by reason of a RICO violation, a

plaintiff must demonstrate that the violation was the proximate and but-for cause of his injuries).

At the time of these correspondences, Plaintiff had at least several years prior assigned his

intellectual property rights to Ramirez and agreed to the terms of the October 2006 Contract, the

Naming Agreement and the Raw Material Agreement.  He could not have been defrauded in those

respects by these subsequent communications.

If the SAC means to allege that the above-cited communications caused Plaintiff a more

recent and separate injury, it does not do so with the degree of particularity required to satisfy Rule

9(b).  Ramirez, the SAC alleges, tried to "dissuade" Plaintiff from "asserting his rights" by falsely

claiming that Ramirez was "upset" with Plaintiff; falsely claiming that Plaintiff "owed [Ramirez]

money for overpayment of royalties"; and falsely claiming that Plaintiff "owed [Ramirez] monies

for [Ramirez's] litigation with his former business partner."  Doc. 28-1, at ¶ 266.  These allegations

are conclusory: the SAC does not explain what "rights" Ramirez tried to dissuade Plaintiff from

asserting, does not explain whether Ramirez was successful in dissuading Plaintiff from asserting

those "rights," and does not explain whether or how Plaintiff was injured by Ramirez's allegedly false

statements.

The gravamen of the SAC is that Ramirez broke certain promises he made to Plaintiff,

namely, three principal agreements: the Naming Agreement, that is, an oral agreement (reached at some unidentified time and place) to alternate the first-named inventor on patent applications; the Raw Material Agreement (another oral agreement reached at some unidentified time and place) to share equally the Cu/ZN raw material sale proceeds; and the October 2006 Contract to share equally the royalties and licensing fees earned from the business venture's patented technologies. *See* Doc. 28-1, at ¶¶ 29, 35 and 36. While the SAC supports the inference that Ramirez led Plaintiff to believe that he would honor those agreements, intentionally false statements by a party indicating his intent to fulfill a contract is not sufficient to support a claim for fraud. "[W]here a fraud claim is premised upon an alleged breach of contractual duties and the supporting allegations do not concern representations which are collateral or extraneous to the terms of the parties' agreement, a cause of action sounding in fraud does not lie." *Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc.*, 98 F.3d 13, 20 (2d Cir. 1996) (internal quotation marks and citations omitted). "To maintain a claim for fraud (including mail or wire fraud) in these circumstances, Plaintiff would need to allege (i) that Defendants owed him a separate duty, (ii) that they made a misrepresentation 'collateral or extraneous to the contract,' or (iii) that he is entitled to special damages not compensable through breach of contract." *Lefkowitz v. Reissman*, 2014 WL 925410 at *5 (quoting and citing *Bridgestone/Firestone*, 98 F.3d at 19-20). The SAC does not make any of these allegations.

Plaintiff does not allege that the proposed Defendants owed him some separate duty beyond Ramirez's obligations under their agreements to share profits equally and alternate the first-named inventor on patent application. Nor does the SAC allege that Ramirez made misrepresentations collateral or extraneous to those agreements, "meaning the misrepresentation of a 'present fact' as opposed to a 'defendant's future intent to honor that contract.'" *Id.* (quoting *Blank v. Baronowski*,

959 F.Supp. 172, 180 (S.D.N.Y. 1997)).  As stated above, the SAC does not specifically identify fraudulent statements made by Ramirez in connection with the consummation of those agreements that satisfy the pleading requirements of Rule 9(b).  Furthermore, the SAC does not allege "special damages," which in this context requires a plaintiff "to show some loss independent of the damages allegedly incurred for breach of contract."  *Id.* (internal quotation marks and citations omitted).

For these reasons, the SAC's other discernable theory of RICO liability — that Ramirez filed patent applications naming himself as the sole inventor in contravention of the Naming Agreement — also fails.  The SAC alleges that between January 11, 2011, and May 13, 2014, Ramirez "committed additional acts of mail and/or wire fraud, by causing to be mailed and/or electronically filed [with the United States Patent and Trademark Office] by means of wire communications fraudulent and deceptive patent applications that listed only Ramirez as inventor."  Doc. 28-1, at ¶ 267.  At most, these allegations suggest that Ramirez used the mail and wire facilities to renege on the Naming Agreement — not that he engaged in a discrete scheme or artifice to defraud that was unrelated to his business dealings with Plaintiff.

As discussed *supra*, allegations that Ramirez filed "fraudulent" patent applications — even if he used the mail and wires to do so — do not support a claim for fraud in the absence of additional allegations showing that: Ramirez owed Plaintiff a duty separate from his agreements with Plaintiff; that Ramirez made a misrepresentation of present fact collateral or extraneous to those agreements; or that Plaintiff is entitled to special damages not compensable through a breach of contract claim.  *See Lefkowitz v. Reissman*, 2014 WL 925410 at *5 (quoting and citing *Bridgestone/Firestone*, 98 F.3d at 19-20).  Plaintiff's allegations that Ramirez broke promises or failed to honor agreements amount at most to claims for breach of contract or common business torts, "which cannot be

23

transmogrified into a RICO claim by the facile device of charging that the breach[es] w[ere] fraudulent, indeed criminal." *Id.* at *8 (quoting *Helios Int'l S.A.R.L v. Cantamessa USA, Inc.*, No. 12 cv 8205, 2013 WL 3943267, at *9 (S.D.N.Y. July 31, 2013)).  Furthermore, even if Ramirez's use of the mail and wires to file allegedly fraudulent and deceptive patent applications constitute the predicate acts of mail and wire fraud, his RICO claim would nevertheless fail because Plaintiff has not plausibly alleged a *pattern* of racketeering activity.

### 4.        Pattern of Racketeering Activity

"According to RICO's definitional section, a 'pattern of racketeering activity' requires at least two acts of racketeering activity." *Spool*, 520 F.3d at 185; *see* 18 U.S.C. § 1961(5).  "The acts of racketeering activity that constitute the pattern must be . . . related, and [either] amount to or pose a threat of continuing criminal activity.'" *Id.* (quoting *Cofacredit, S.A. v. Windsor Plumbing Supply Co.*, 187 F.3d 228, 242 (2d Cir. 1999) (emphasis omitted)); *see H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 239 (1989).  "The latter so-called 'continuity' requirement can be satisfied either by showing a 'close-ended' pattern — a series of related predicated acts extending over a substantial period of time — or by demonstrating an 'open ended' pattern of racketeering activity that poses a threat of continuing criminal conduct beyond the period during which the predicate acts were performed." *Id.* (citing *H.J. Inc.,* 492 U.S. at 241; *DeFalco v. Bernas*, 244 F.3d 286, 305 (2d Cir. 2011); *Cofacredit*, 187 F.3d at 242; *GICC Capital Corp. v. Tech. Fin. Corp.*, 67 F.3d 463, 465 (2d Cir. 1995)).  Neither a close-ended or an open-ended pattern is discernable in the SAC.

### i.        Closed-Ended Pattern

A close ended pattern involves "a series of related predicate acts extending over a substantial period of time." *Spool*, 520 F.3d at 183-84.  "[C]losed-ended continuity is primarily a temporal

concept," and the Second Circuit has "never held a period of less than two years to constitute a 'substantial period of time.'" *Cofacredit*, 187 F.3d at 242; *see also United States v. Veliz*, ⸺ Fed. Appx. ⸺, ⸺, No. 13 914 CR, 2015 WL 4923704, at *3-4 (2d Cir. Aug. 19, 2015); *Spool*, 520 F.3d at 184.  Although predicate acts spanning over two years may constitute a close-ended pattern of racketeering activity, two year is not "a bright line requirement." *Spool*, 520 F.3d at 184. "[W]hile two years may be the *minimum* duration necessary to find close-ended continuity, the mere fact that predicate acts span two years is insufficient, without more, to support a finding of a closed-ended pattern.'" *First Capital Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159, 181 (2d Cir. 2004) (emphasis in original); *see also Spiteri v. Russo*, 2013 WL 4806960 at *51 (citing same).  The Second Circuit has identified several "non-dispositive factors" considered by the courts in determining whether closed-ended continuity exists,  "including, *inter alia*, the length of time over which the alleged predicate acts took place, the number and variety of acts, the number of participants, the number of victims, and the presence of separate schemes." *GICC Capital Corp. v. Tech. Fin. Group. Inc.*, 67 F.3d 463, 467 (2d Cir. 1995); *see Li Jun An v. Hui Zhang*, No. 13 CIV. 5064 (PKC), 2013 WL 6503513, at *8 (S.D.N.Y. Dec. 6, 2013) (citing same).

Assuming, *arguendo*, that the instances of fraud, alleged *supra*, constitute the predicate acts of mail and wire fraud, that conduct, notwithstanding the fact that it spanned more than two years, would not qualify as a pattern of racketeering activity under the variety of non-dispositive factors the Second Circuit directs courts to evaluate when considering whether close-ended continuity exists. *See GICC Capital Corp. v. Tech. Fin. Group. Inc.*, 67 F.3d at 467 (listing non-dispositive factors and stating that "plaintiff must provide some basis for a court to conclude that defendants' activity were neither isolated nor sporadic") (internal quotation marks and citations omitted).  The SAC alleges

only one participant — Ramirez.  Members of Ramirez's family are identified as "co-conspirators,"
but the SAC does not allege how they individually engaged in a "scheme or artifice to defraud"
Plaintiff.  Nor does the SAC allege that Ramirez's activities affected a number of victims.  Only one
victim is identified in the SAC — Plaintiff.  Finally, the SAC alleges only one scheme — a scheme
to defraud Plaintiff.  The Court is therefore unable to conclude that the SAC alleges a close-ended
pattern of racketeering activity.  *See Spiteri v. Russo*, 2013 WL 4806960 at *53 (collecting cases
where continuity requirement was not met where alleged scheme lasted two years or more and other
factors required to establish close-ended continuity were not adequately alleged); *see also First
Capital Asset Mgmt., Inc.*, 385 F.3d at 182 (concluding that "every factor other than duration cuts
against a finding of close-ended continuity")[4]; *GICC Capital Corp.*, 67 F.3d at 467-69 (concluding
that continuity requirement was not satisfied where alleged pattern of racketeering lasted less than
two years and complaint alleged "only a handful of participants," only one victim, and had not
alleged a "complex, multi-faceted scheme to defraud executed by numerous officers and
stockholders") (internal quotation marks and citation omitted)).

### ii.    **Open-Ended Pattern**

An open-ended pattern of racketeering activity "poses a threat of continuing criminal conduct
beyond the period during which the predicate acts were performed." *Spool*, 520 F.3d at 183.  "This
threat is generally presumed when the enterprise's business is primarily or inherently unlawful";

---

[4] The district court in *First Capital*, whose opinion on the point the Second Circuit expressly
approved (385 F.3d at 182), said that acts occurring over a period longer than two years "do not
automatically form a pattern," and added: "Other factors such as the number and variety of predicate
acts, the number of both participants and victims, and the presence of separate schemes are also
relevant in determining whether closed-end continuity exists."  219 F. Supp. 2d 576, 585-586
(S.D.N.Y. 2002) (citations and internal quotation marks omitted).

when "the enterprise primarily conducts a legitimate business, however, no presumption of a continued threat arises." *Id.* at 185 (quoting *Cofracredit*, 187 F.3d at 243) (internal quotation marks omitted); *see Plainville Elec. Products Co. v. Vulcan Advanced Mobile Power Sys., LLC*, 638 F. Supp. 2d 245, 254 (D. Conn. 2009) (citing same). In such cases, "there must be some evidence from which it may be inferred that the predicate acts were the regular way of operating that business, or that the nature of the predicate acts themselves implies a threat of continued criminal activity." *Id.* (quoting *Cofracredit*, 187 F.3d at 243) (internal quotation marks omitted).

Even if the SAC did plausibly allege that Ramirez or members of his "enterprise" committed the predicate acts of mail or wire fraud, it would still be deficient in the absence of allegations "showing that the acts of mail and wire fraud typified [Defendants] regular way of conducting their business." *Cofracredit*, 187 F.3d at 244. Ramirez is engaged in a primarily legitimate business — the business of developing and manufacturing patentable chemical technologies for sale. Alleged fraudulent filings with USPTO and other deceptive communications through the mail and wires — even if they could be called predicate acts — were discrete and incidental to a primarily legitimate business objective. Furthermore, the nature of the predicate acts do not imply the threat of ongoing activity. Ramirez has already caused Plaintiff to assign his intellectually property rights to JR Chem, LLC, and has already filed allegedly fraudulent patent applications with the USPTO. The alleged scheme to defraud Plaintiff is therefore "inherently terminable." *Cofacredit*, 187 F.3d at 244 ("'[A]n inherently terminable' scheme does not imply a threat of continued racketeering activity."); *GICC Capital Corp.*, 67 F.3d at 466 ("It defies logic to suggest that a threat of continued looting activity exists when, as plaintiff admits, there is nothing left to loot."); *see Plainville Elec. Products Co.* at 638 F. Supp. 2d at 254 (quoting same and concluding that "[t]he threat of continuing criminal

activity moving forward cannot concern nonpayment to [plaintiff] for work done under [plaintiff's] contract with [defendant]").

Based on the foregoing discussion, it is apparent that the SAC fails to state a RICO claim. Plaintiff has already amended his RICO claims once. He has not cured the pleading deficiencies identified in the Court's December 2014 Ruling, which included, *inter alia*, the first proposed amended complaint's failure to state the existence of a RICO enterprise and the predicate acts of mail and wire fraud. After carefully considering both amended pleadings, the Court believes that this case is a dispute between two business partners, which while perhaps supporting state law tort, fraud or contract claims, has none of the trappings of a RICO litigation. The problem with the SAC's RICO claims are substantive and cannot be cured by better pleading. *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000). The Court therefore concludes Plaintiff's motion for leave to assert RICO claims will be denied, without leave to replead these claims further.

**B.  Declaratory Judgment of Inventorship (Issued Patents)**

Plaintiff seeks leave to amend the complaint to assert claims for declaratory judgment of inventorship regarding eleven patents issued by the USPTO between January 24, 2008, and August 13, 2013 (counts 1-11). The SAC's claims of declaratory judgment of inventorship are Plaintiff's latest theory of liability — he did not assert this cause of action in the first proposed amended complaint, or in the original complaint for that matter.

Defendants do not profess to be prejudiced by these claims or assert that they are the product of undue delay. Nor could they. Delay alone, in the absence of bad faith or prejudice, is not a sufficient reason for denying a motion to amend, *Ruotolo v. City of New York,* 514 F.3d 184, 191 (2d Cir. 2008). And undue prejudice generally arises "where an amendment [comes] on the eve of trial

and would result in new problems of proof." *State Teachers Retirement Bd. v. Fluor Corp.*, 654 F.2d 843, 856 (2d Cir. 1981); *see also Duling v. Gristede's Operating Corp.*, 265 F.R.D. 91, 98 (S.D.N.Y. 2010) ("A change in litigation strategy is a legitimate reason for seeking to amend a pleading under the liberal standard of Rule 15(a)." ).

While it is curious that Plaintiff's correction of inventorship claims did not occur to him before he filed this *second* amended complaint, they cannot be denied merely because they were not asserted sooner.  The Court will consider them.

Although the SAC seeks a declaration that Plaintiff invented each of the eleven patents issued by the USPTO, the SAC also alleges that Plaintiff *is a named co-inventor on each patent* — an allegation at odds with the declaratory relief requested. In Plaintiff's response to Defendants' objection to the instant motion he has this to say about his inventorship claims:

> Defendants Ramirez and JR Chem, LLC expend considerable effort debating defendant Ramirez's alleged rights as joint inventor, apparently misreading some of Counts One through Eleven.  Only in Counts One and Two of the proposed complaint does the plaintiff specifically seek declarations that he is the owner of those particular patents because the plaintiff is the "sole inventor" of those patents and defendant Ramirez did not contribute to either of [the] inventions in any way.  With respect to the inventions in Counts Three through Eleven, the plaintiff acknowledges that Ramirez is entitled to rights as a joint inventor, but seeks declarations of ownership based upon Ramirez's unscrupulous acts.

Doc. 31, at 2.  A sense of confusion creeps into this theorizing.  Counts one through eleven of the SAC are captioned, "Declaratory Judgment of Ownership and Inventorship of the [numbered] Patent."  The SAC states unequivocally (and the Court takes judicial notice of the fact) that each of the issued patents "lists the plaintiff as a true inventor of its subject matter," yet prays for "declarations that plaintiff is the inventor . . . of the [issued ] patents."  *Id.* at p. 63.  Plaintiff's

explication of these claims, cited above, does not completely clarify the confusion because it speaks only to the theories underpinning his claims for declaration of *ownership*: one theory (in counts 1 and 2) based on his status as the issued patents' sole inventor, and another theory (in counts 3-11) based on Ramirez's "unscrupulous acts."  Doc. 31, at 2.

The most that can be inferred from the SAC's declaration of inventorship claims — and it is a generous inference in light of the fact Plaintiff is represented by counsel — is that with respect to the two issued patents identified in counts one and two, U.S. Patent No. 7,927,614 ('614 patent) and U.S. Patent No. 7,867,522 ('522 patent), Plaintiff seeks a declaration that he is the *sole* inventor of these patents.  This inference is supported by the SAC's allegations at paragraphs 59 and 65 that "Ramirez did not contribute to the subject matter of any claim of the" '614 and '522 patents.  Doc. 28-1, at ¶¶ 59, 65.  Plaintiff, it would seem, is not contesting the inventorship of the nine other issued patents identified in counts three through eleven.  He admits that "Ramirez is entitled to rights as a joint inventor" with respect to those patents.  Doc. 31, at 2.  The Court therefore confines its analysis to whether the SAC states a claim for declaratory judgment of *sole* inventorship with respect to the '614 and '522 patents.

Conceptually, a declaration of inventorship may be achieved through 35 U.S.C. § 256 — the controlling statute for correction of inventorship —  or alternatively, pursuant to the Declaratory Judgment Act (or "DJA"), 28 U.S.C. § 2201(a), provided that with respect to the latter, there is an independent basis for the Court to exercise subject matter jurisdiction.  The SAC does not expressly invoke § 256, but that oversight, while unaccountable, is not necessarily a basis for concluding that the SAC does not state a valid claim.  *Cf. Larson v. Correct Craft, Inc.*, 569 F.3d 1319, 1325 (Fed. Cir. 2009) (concluding that plaintiff had "pleaded an action for correction of inventorship pursuant

to § 256" where he sought "[i]n substance the same relief that the patent statute provides in § 256").[5] As no independent basis of subject matter jurisdiction necessary to support a DJA action is discernable in the SAC, the Court will consider only whether the SAC states a claim for correction of inventorship under § 256. *Cf. Chou v. University of Chicago*, 254 F.3d 1347, 1357-60 (Fed. Cir. 2001) (concluding that plaintiff's claims for declaratory judgment of inventorship need not be analyzed under DJA where plaintiff had standing to assert the same pursuant to § 256).

A claim pursuant to § 256 implicates this federal court's subject matter jurisdiction because it "aris[es] under" the patent laws within the meaning of 28 U.S.C. § 1338, which confers upon United States district courts original jurisdiction of any civil action arising under the federal patent laws. *Larson*, 569 F.3d at 1325. Section 256(a) states in its entirety:

> **(a) Correction.**--Whenever through error a person is named in an issued patent as the inventor, or through error an inventor is not named in an issued patent, the Director may, on application of all the parties and assignees, with proof of the facts and such other requirements as may be imposed, issue a certificate correcting such error.
>
> **(b) Patent valid if error corrected.**--The error of omitting inventors or naming persons who are not inventors shall not invalidate the patent in which such error occurred if it can be corrected as provided in this section. The court before which such matter is called in question may order correction of the patent on notice and hearing of all parties concerned and the Director shall issue a certificate accordingly.

35 U.S.C. § 256.

---

[5] In citing Federal Circuit authority throughout this Ruling the Court notes that the Federal Circuit has exclusive jurisdiction over all federal district court appeals involving patent infringement actions. *See Cardinal Chemical Co. v. Morton Int'l, Inc.*, 508 U.S. 83, 89 (1993) ("Because the Federal Circuit has exclusive jurisdiction over appeals from all United States District Courts in patent litigation . . . the rule[s] that it applies . . . [are] of special importance to the entire Nation.").

Thus, § 256 provides a cause of action for judicial correction of two categories of inventor errors: misjoinder and nonjoinder. *See Stark v. Advanced Magnetics, Inc.,* 119 F.3d 1551, 1553 (Fed. Cir. 1997); *Univ. of Utah v. Max Planck Gesellschaft zur Forderung der Wissenschaften E.V.*, 881 F. Supp. 2d 151, 157 (D. Mass. 2012) *aff'd*, 734 F.3d 1315 (Fed. Cir. 2013). Misjoinder occurs when a person who is not an inventor is named as an inventor, while nonjoinder occurs when a person is an inventor and not named as one. *See id.* at 1553-55. The SAC apparently seeks correction of the error of misjoinder because Ramirez has allegedly been improperly named as a co-inventor on the '614 and '522 patents. Section 256(a) allows for deletion of a misjoined inventor "[w]henever through error a person is named in an issued patent as the inventor." 35 U.S.C. § 256.

However, a party may not invoke § 256 without meeting constitutional standing requirements. *Chou v. University of Chicago*, 254 F.3d at 1357. Specifically, a party must show that he has suffered an injury-in-fact, that the injury is traceable to the conduct complaint of, and that the injury is redressable by a favorable decision. *Id.* Where a party lacks an ownership interest in the patent, and will not receive any other direct financial rewards from being declared the inventor of the patent, that party does not have standing to sue under § 256. *See Larson v. Correct Craft, Inc.*, 569 F.3d at 1327; *see also Vita Herb Nutriceuticals, Inc. v. Probiohealth, LLC*, No. SACV 11 1463 DOC, 2013 WL 1182992, at *3 (C.D. Cal. Mar. 20, 2013) (citing *Larson* for same rule); *Am. Nav. Sys., Inc. v. Michalson*, No. CIV.A. 11 10304 (FDS), 2011 WL 5330533, at *2 (D. Mass. Nov. 4, 2011) (also citing *Larson* for same).

In *Larson*, the Federal Circuit considered whether the designer of a certain type of nautical equipment, who had assigned his interest in that invention to his employer, could sue to correct inventorship pursuant to § 256. The court, in a decision incidentally authored by Judge Arterton of

this District while sitting by designation on the Federal Circuit, held that "[b]ecause Larson lacks an ownership interest [in the patent], and because being declared the sole inventor will not generate any other direct financial rewards . . . Larson has no constitutional standing to sue for correction of inventorship in federal court." *Id.* at 1327.

In reaching that conclusion, the court distinguished Larson's case from the plaintiff in *Chou v. University of Chicago.*  Like Larson, Chou, a research scientist employed by the University of Chicago, had brought a § 256 claim, alleging that she had not been listed as an inventor on certain issued patents.  Chou had also assigned her interest in her inventions to her employer.  However, unlike Larson, the policy of Chou's employer provided that inventors would receive "25% of the gross royalties and up-front payments from licensing of the patents, as well as 25% of the stock of new companies that are based on their inventions." *Chou v. University of Chicago*, 254 F.3d at 1353.  The court concluded that Chou had satisfied the requirements of Article III standing as she had "alleged a concrete financial interest in the patent, albeit an interest less than ownership." *Id.* at 1359.

Larson, in contrast, had "affirmatively transferred title to the patents to" his employer and thus "st[ood] to reap no benefit from preexisting licensing or royalties arrangement." *Larson*, 569 F.3d at 1326.  "His only path to financial reward under § 256," the court reasoned, "involves him first succeeding on his state law claims and obtaining rescission of the patent assignments." *Id.* at 1326- 27.  The court therefore concluded that Larson had "no constitutional standing to sue for correction of inventorship in federal court" since "Larson's financial stake in the patents is contingent on him obtaining relief that a federal court has no jurisdiction under § 1338 to provide." *Id.* at 1327.

As in *Larson*, the proposed pleading at bar alleges unequivocally that Plaintiff affirmatively

33

assigned his ownership interest in the '614 and '522 patents to JR, Chem, LLC.  Doc. 28-1, at ¶¶ 157, 166; *see also id.* ¶¶ 28, 30, 37, 50, and 51.  Furthermore, the SAC does not allege that Plaintiff has a "concrete financial interest" in being named as the sole inventor of those patents.  Pursuant to his agreement with Ramirez, the SAC alleges that Plaintiff is entitled to receive royalties earned from his patented and patentable inventions; however, unlike the plaintiff in *Chou*, payment of such royalties is not contingent on Plaintiff being named as an inventor on the issued patents.  The SAC's claims for declaratory judgment of inventorship therefore fail under *Chou* and *Larson*.  Plaintiff has not alleged an ownership or financial interest in the '614 and '522 patents and does have Article III standing to sue under § 256 for correction of inventorship.

One final point relating to Plaintiff's ability to replead these claims must be made.  In both *Larson* and *Chou* the Federal Circuit expressly declined to decide whether a plaintiff has Article III standing to assert a § 256 claim based on a reputational interest in being correctly named as the inventor on issued patents.  Though that theory of constitutional standing was alleged by the plaintiff in *Chou*, the court, while noting that Article III standing based on a reputational interest was "not implausible," ultimately determined that it need not decide the question given that Chou had a financial interest in being named as an inventor.  In *Larson*, the court again declined to decide the question because the plaintiff in that case had not alleged reputational injury.  *Larson*, 569 F.3d at 1327-28.  There is a split amongst district courts as to whether a reputational injury can confer Article III standing upon § 256 plaintiffs.  *Compare Hoang v. Abbot Labs*, No. 08 C 189, 2009 WL 1657437, at *3 (N.D. Ill. June 12, 2009) (concluding that even if plaintiff could establish Article III standing based solely on reputational injury, claim failed at summary judgment stage where plaintiff provided no evidence, such as lost employment opportunities, to show her reputation had been

34

injured); *Barnette v. Dicello*, 616 F. Supp.2d 709, 714 (N.D. Ohio 2007) (plaintiff had not demonstrated that for standing purposes, inventorship "designation would even constitute a 'mark in success of one's field'"); *Cole v. Gummow*, No. 3-02-CV-0705-BD(P), 2003 WL 22455387, at *3 (N.D. Tex. Oct. 22, 2003) (rejecting "reputational interest" theory of standing because "bald assertions" of reputational interest are insufficient to carry plaintiff's burden of proof) *with Krauser v. Evollution IP Holdings, Inc.*, 975 F. Supp. 2d 1247, 1255-57 (S.D. Fla. 2013) (concluding at motion to dismiss stage that plaintiff had standing to challenge inventorship under § 256 because like a claim for common law defamation, actual harm to plaintiff's reputation need not be shown since "the publication *itself*" constitutes an injury) (emphasis in original)); *Shukh v. Seagate Tech., LLC*, No. CIV. 10 404 (JRT) (JJK), 2011 WL 1258510, at *8 (D. Minn. Mar. 30, 2011) (concluding at motion to dismiss stage that plaintiff had standing to challenge inventorship under § 256 "due to potential harm to his reputational interests"); *Czarnik v. Illumina, Inc.*, 437 F. Supp. 2d 252, 256 (D. Del. 2006) (plaintiff had standing under § 256 at motion to dismiss stage where he alleged that he suffered harm to his reputation and standing in scientific community and was unable to secure employment and earn a particular salary).

This Court need not resolve the question of whether reputational injury alone is enough to satisfy the requirements of Article III standing because the SAC does *not* expressly allege that Plaintiff suffered damage to his reputation by being named only as co-inventor (and not the sole inventor) on the '614 and '522 patents. *Cf. Larson*, 569 F.3d at 1328 ("[W]e need not answer the question we left open in *Chou* — whether a purely reputational interest is sufficient to confer standing for a § 256 claim — because the issue is simply not presented by these facts. Larson claims no reputational injury, and so that cannot be a basis on which to find standing."). Nor in Plaintiff's

papers on the instant motions does he posit such a theory.  He has not even considered the standing problem, much less cited or discussed § 256.

However, in support of Plaintiff's separate claim that Ramirez breached the Naming Agreement — that is, the agreement between Plaintiff and Ramirez to alternate the first-named inventor on patent applications — the SAC alleges that breach of that agreement caused Plaintiff "injury to his professional reputation" and to be "deprived of recognition of his work to which he is entitled." Doc. 28-1, at ¶ 279.  Nothing in the SAC suggests that Plaintiff was not listed as the first-named inventor on the '614 and '522 patents.  Indeed, the Court takes judicial notice of the fact that on both the '614 and '522 patents, Plaintiff is named first.  But the SAC's allegation that Plaintiff suffered a reputational injury from designation as the second-named inventor on *other* patents, raises the question of whether he also perceives an injury to his reputation resulting from his incorrect designation as *one of two inventors* of the '614 and '522 patents, albeit the first-named one.  It would be improper for the Court to draw such an inference from the SAC, but in light of discernable whispers of reputational injury alleged therein, I think it would be equally improper to deny these claims with prejudice to refiling.

If Plaintiff is so advised, he may amend his correction of inventorship claims to assert a reputational injury.  Leave to replead is appropriate in light of the fact that denying these claims with prejudice would deprive Plaintiff the opportunity to reassert a potentially viable cause of action, since the question of whether a reputational injury confers Article III standing under § 256 is an open question in the Second Circuit and the Federal Circuit and some district courts have concluded that it is a basis upon which Article III standing may be conferred.  If Plaintiff chooses to file a motion to amend his pleading, it must be accompanied by a brief explaining why the Court should adopt the

view that a reputational injury alone is enough to satisfy the requirements of Article III standing.  As the law in this respect is unsettled and appears to be a question of first-impression in this circuit, the Court intimates no view as to whether it would ultimately allow an amendment based on the reputational interest theory of standing.

## C.    Declaratory Judgment of Inventorship (Patent Applications)

The SAC also seeks declaratory judgments that Plaintiff is the inventor of chemical technologies for which Ramirez has filed patent *applications*.  The conclusion that the SAC does not allege Article III standing to assert claims to correct inventorship on issued patents would preclude these corresponding claims even if claims to correct inventorship on patent applications were viable causes of action *per se*.  They are not.  The Federal Circuit has made clear that while 35 U.S.C. § 256 "provides a private right of action to challenge inventorship" for issued patents, 35 U.S.C. § 116, which governs inventions, "does not provide a private right of action to challenge inventorship of a pending patent application." *HIF Bio., Inc. v. Yung Shin Pharm. Indus. Co.*, 600 F.3d 1347, 1354 (Fed. Cir. 2010); *see also Kamdem Ouaffo v. Pepsico, Inc*., No. 14 CV 227 (KMK), 2015 WL 1011816, at *14 (S.D.N.Y. Mar. 9, 2015) (citing same in concluding that plaintiff "cannot bring a cause of action for a correction of inventorship for the four pending patent applications"); *Picazio v. Melvin K. Silverman & Associates, P.C.*, 965 F. Supp. 2d 1411, 1416 (S.D. Fla. 2013) (concluding that § 256 claim to correct inventorship was not ripe for adjudication because naming error occurred on patent application and no patent had issued).  The SAC's claims to correct the inventorship designation on patent applications will be dismissed without prejudice to repleading should the patent applications mature into issued patents.

## D.    Declaratory Judgment of Ownership

The SAC also asserts claims seeking declarations that Plaintiff owns the issued patents and the chemical technologies for which patent applications have been filed and are pending.  It is well-settled that ownership and inventorship are separate issues because "inventorship is a question of who actually invented the subject matter claimed in a patent.  Ownership, however, is a question of who owns legal title to the subject matter claimed in a patent, patents having the attributes of personal property."  *Beech Aircraft Corp. v. EDO Corp.*, 990 F.2d 1237, 1248 (Fed. Cir. 1993) (citing 35 U.S.C. § 261 (relating to patent ownership)).

The SAC's claims for declaratory judgment of ownership assume a basis for the Court's subject matter jurisdiction that is not discernable in the proposed pleading. The Declaratory Judgment Act, 28 U.S.C. § 2201, pursuant to which the SAC presumably predicates its claims for declaratory relief, does not independently create federal jurisdiction.  *Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667, 671-72 (1950); *accord  Warner Jenkinson Co. v. Allied Chem. Corp.*, 567 F.2d 184, 186 (2d Cir. 1977).  "Rather, it provides a remedy available only if the court has jurisdiction from some other source." *Prasco, LLC v. Medicis Pharm. Corp.*, 537 F.3d 1329, 1335 (Fed. Cir. 2008).  Furthermore, actions pursuant to the Declaratory Judgment Act are justiciable only in cases in which an "actual controversy" exists.  28 U.S.C. § 2201(a); *see also MedImmune, Inc. v. Genentech*, Inc., 549 U.S. 118, 126-27 (2007) (explaining that the actual controversy" requirement is coextensive with the "case or controversy" standard embodied in Article III of the United States Constitution).

There is no actual controversy regarding the ownership of the patents and patentable technologies in question.  The SAC makes crystal clear that Plaintiff assigned his ownership interest in the chemical technologies to JR, Chem, LLC.  Doc. 28-1, at ¶¶ 67, 77, 86, 95, 104, 113, 121, 131,

140, 157, 166; *see also id.* 28, 30, 37, 50, and 51.  It is apparent from the SAC that whatever harm may have befallen Plaintiffs derives not from Defendants' lawful use of those patents, but from the allegation that Plaintiff's assignment of his interests in those patents was induced by fraud.  Though styled as claims for "Declaratory Judgment of Ownership," the SAC's claims in this respect are in substance common law claims for *rescission* that seek an equitable determination of patent ownership as a measure of damages.  Such claims do not implicate this federal district court's subject matter jurisdiction.  Accordingly, the Court does not consider them.

**E.**    **Patent Infringement and Infringement by Inducement**

The SAC's claims for patent infringement, 35 U.S.C. § 271(a), against Obagi, and infringement by inducement, 35 U.S.C. § 271(b), against Ramirez, also fail as a matter of law.  The Federal Circuit has stated that to assert a claim for patent infringement pursuant to § 271, a pleading must contain, *inter alia*, "a statement that plaintiff owns the patent."  *McZeal v. Sprint Nextel Corp.*, 501 F.3d 1354, 1357 (Fed. Cir. 2007).  As stated *supra*, not only does the SAC not allege ownership, with respect to each of the eleven patents that Obagi is allegedly infringing, it states unequivocally, and repeatedly, that Plaintiff assigned his interests in each chemical invention to JR Chem, LLC.  Doc. 28-1, at ¶¶ 67, 77, 86, 95, 104, 113, 121, 131, 140, 157, 166; *see also id.* 28, 30, 37, 50, and 51.  The patent infringement claims alleged in the *first* proposed amended complaint failed largely because Plaintiff did not allege that he owned the patents in question.  *Faryniarz v. Ramirez*, 62 F. Supp. 3d 240, 256-59 (D. Conn. 2014).  The patent infringement claims asserted in the SAC fail for the same reason.

Furthermore, because the SAC does not state a claim for direct patent infringement in violation of 35 U.S.C. § 271(a), it also fails to state a claim against Ramirez for infringement by

39

inducement in violation of 35 U.S.C. § 271(b).  It is axiomatic that '[t]here can be no inducement or contributory infringement without an underlying act of direct infringement.'"  *In re Bill of Lading*, 681 F.3d at 1333 (quoting *Linear Tech. Corp. v. Impala Linear Corp.*, 379 F.3d 1311, 1326 (Fed. Cir. 2004) (citation omitted)); *see also Dynacore Holdings Corp. v. U.S. Philips Corp.*, 363 F.3d 1263, 1272 (Fed.Cir.2004) ("Indirect infringement, whether inducement to infringe or contributory infringement, can only arise in the presence of direct infringement"); *Joy Techs., Inc. v. Flakt, Inc.*, 6 F.3d 770, 774 (Fed.Cir.1993) ("Liability for either active inducement of infringement or for contributory infringement is dependent upon the existence of direct infringement."); *Faryniarz v. Ramirez*, 62 F. Supp. 3d at 260 (citing the foregoing authority).  Not to be deterred by Court's prior Ruling, the plain language of § 271, or supporting case law —  which make clear that one needs to own a patent in order to assert a claim for patent infringement, and to establish direct infringement to state a claim for infringement by inducement  — Plaintiff has realleged in the SAC patent infringement claims based on patents he admits he does not own.

Plaintiff's theory of the Court's subject matter jurisdiction over these claims is that questions surrounding patent ownership, patent infringement and the fraud that induced Plaintiff to assign away his interests in patentable technologies, are linked so inextricably that this case "arises under" the patent laws within the meaning of 28 U.S.C. § 1338.  *See* Doc. 31, at 1-4.  Plaintiff is mistaken. A claim arises under the patent law if patent law creates the cause of action or is a necessary element of one of the well-pleaded claims.  *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 808-09 (1988).  Because this is not a case in which patent law is a necessary element of some other well-pleaded claim, federal subject matter jurisdiction exists only if patent law creates the cause of action. *See Jim Arnold Corp. v. Hydrotech Systems, Inc.*, 109 F.3d 1567, 1571 (Fed. Cir. 1997).  "To invoke

the jurisdiction of a federal court under § 1338, it is necessary that plaintiff allege facts that demonstrate that he, and not the defendant, *owns* the patent rights on which the infringement suit is premised." *Id.* at 1571-72 (emphasis added).

The circumstances of this case are not unlike the facts alleged *Jim Arnold Corp.*, in which the Federal Circuit determined that the district court lacked subject matter jurisdiction over plaintiff's claims for patent infringement.  In that case the plaintiff had assigned away all of his patent rights and sued for patent infringement and rescission of the assignments through claims brought under state law.  Reaffirming the principle that the "the question of whether a patent is valid and infringed is ordinarily one for federal courts, while the question of who owns the patent rights and on what terms typically is question exclusively for state courts," the court concluded that plaintiff lacked standing to sue for patent infringement because he did not have an ownership interest in the patents. *Id.* at 1572.  As the court put it:

> [W]hen the infringement suit involves an assignment, unless the assignment may be declared null and void by operation of law — either through a forfeiture provision present in the agreement or under a provision of applicable state law — an assignor suing for infringement must first affirmatively seek equitable relief from a court to rescind or cancel the assignment.  Until ownership is restored in the assignor, there can be no act of infringement by the assignee.  Federal question jurisdiction must exist at the time the complaint is filed for a federal court to exercise authority over the case . . . and without first receiving equitable relief that restores to the assignor title to the patent, any claim of ownership by the assignor will be unfounded.  Further, because an action to rescind or cancel an assignment is a state law based claim . . . absent diversity jurisdiction it is to a state court that plaintiffs must look in seeking a forfeiture of the license.

*Id.* at 1577 (citations omitted).  The SAC seeks rescission of Plaintiff's assignments to JR Chem, LLC and declarations of ownership — remedies which are inherently equitable in nature.  This

Court's equitable powers are circumscribed by the limits of its jurisdiction.  This case falls outside this federal court's limited jurisdiction because the SAC alleges neither federal question nor diversity of citizenship jurisdiction.

The Federal Circuit's decision in *Jim Arnold Corp.* makes clear that for a claim of infringement to lie against Defendants, Plaintiff must *first* obtain a court ruling cancelling or rescinding his assignments to JR Chem, LLC and declaring his ownership interest in the patents. Without such a declaration of ownership he is without standing to sue for patent infringement.  As the Federal Circuit later stated in *Paradise Creations, Inc. v. UV Sales, Inc.*, 315 F.3d 1304 (Fed. Cir. 2003), "in order to assert standing for patent infringement, the plaintiff must demonstrate that it held enforceable title to the patent *at the inception of the lawsuit*." *Id.* at 1309 (emphasis in the original); *see Lujan v. Defenders of Wildlife*, 504 U.S. 555, 571 n. 5 (1992) (stating "standing is to be determined as of the commencement of suit").  Furthermore, absent a federal question or diversity of citizenship invoking a federal district court's subject matter jurisdiction, Plaintiff must seek a declaration of ownership in state court.  Plaintiff's claims for patent infringement will therefore be denied without prejudice to his right to replead these claims after obtaining a court order declaring him the owner of the patents in question.

## F.  <u>State Statutory and Common Law Claims</u>

The remainder of the SAC alleges violations of state statute and the common law.  The Court does not reach the merits of these claims because as stated *supra*, the SAC does not allege federal subject matter jurisdiction.

Should Plaintiff, in accordance with this Court's discussion in part V.B of this Ruling, replead § 256 claims for inventorship correction, nothing in this Ruling would prevent Plaintiff from

repleading these non-federal claims.  They will therefore be dismissed without prejudice to refiling in conjunction with a federal cause of action, and in addition, without prejudice to the assertion of these claims in a state court of competent jurisdiction.

I make Plaintiff's right to replead these state statutory and common law claims explicit in this Ruling because in its opposition to the instant motion, Defendants claim that the Court's December 2014 Ruling permitted Plaintiff to replead only the federal claims asserted in the first amended complaint.  In that Ruling, the Court stated: "Plaintiff's motion to amend his complaint . . . is DENIED, WITHOUT PREJUDICE to his right to replead . . . the federal claims sought to be asserted in the proposed amended complaint."  Doc. 27, at 30 (caps in the original).  While the Court was silent as to Plaintiff's right to replead his non-federal claims, the Ruling, which in the absence of subject matter jurisdiction did not reach the merits of those claims, cannot be reasonably construed as denying Plaintiff's non-federal claims with prejudice to refiling.  Moreover, because the Court has not addressed the merits of Plaintiff's state statutory and common law claims in this Ruling, let alone concluded that any of them are viable as a matter of law, Defendants have not been prejudiced by any ambiguity in the Court's prior Ruling.

## VI

If there is any truth to the adage, "*third time's the charm*,"[6] it does not resonate at bar.  To date, Plaintiff has filed a complaint, a proposed amended complaint, and a second proposed amended complaint.  Neither of them have stated a cause of action invoking this federal district court's subject matter jurisdiction.  Moreover, Plaintiff's third bite at the apple has repeated civil RICO and patent infringement claims based largely on the same allegations and theories this Court determined did not

---

[6] McGraw-Hill, *Dictionary of American Idioms and Phrasal Verbs* (2002).

43

give rise to a viable cause of action in its December 2014 Ruling.

For the reasons stated *supra*, Plaintiff's second motion to amend the complaint, [Doc. 28-1], is DENIED. The Court makes the following rulings concerning certain specific claims and Plaintiff's right *vel non* to replead them:

1.     Plaintiff's RICO claims (counts 25-27) are DENIED without leave to replead.

2.     Plaintiff's claims pursuant to 35 U.S.C. § 256 for declaratory judgment of inventorship of the issued patents (counts 1-11) ARE DENIED without prejudice to repleading in accordance with the requirements for repleading discussed in part V.B. of this Ruling. Plaintiff is advised, however, that if he wishes to allege a § 256 claim to correct the *order* of inventors, 35 U.S.C. § 256 does not authorize the district courts to order the Director of Patents and Trademarks "to change the order of inventors on the patents." *Fina Tech., Inc. v. Ewen*, 265 F.3d 1325, 1326 (Fed. Cir. 2001). Plaintiff is also advised that while 35 U.S.C. § 256 authorizes the district courts to correct inventorship, "the plain language of the statute falls short of *requiring* the federal court to do so" and the Court may decline jurisdiction over the claim. *LendingTree, LLC v. Zillow, Inc.*, 54 F. Supp. 3d 444, 451 (W.D.N.C. 2014) (emphasis in original); *see also* 35 U.S.C. § 256 ("The court before which such matter is called in question *may* order correction of the patent . . .") (emphasis added).

3.     Plaintiff's claims for declaratory judgment of inventorship relating to chemical technologies for which patent applications have been filed (counts 23-24) are DENIED without prejudice to repleading should those applications mature into issued patents and subject to the requirements for repleading discussed in part V.B. of this Ruling.

4.     Plaintiff's claims for patent infringement in violation of 35 U.S.C.§ 271(a), and

infringement by inducement in violation of 35 U.S.C.§ 271(b) (counts 12-22) are DENIED without prejudice to repleading those claims should Plaintiff obtain a court order declaring his ownership interest in the issued patents.

5.    Plaintiff's non-federal claims (counts 28-36), including his claims for declaratory judgment of ownership (counts 1-11), which the court construes as common law claims for rescission, are DENIED without prejudice to repleading those claims in state court or a federal court with subject matter jurisdiction to hear them.

6.    Any additional motion to amend the complaint that Plaintiff chooses to file in this case must be made not later than **November 30, 2015**.

It is SO ORDERED.

Dated:   New Haven, Connecticut
         November 9, 2015

    /s/ *Charles S. Haight, Jr.*
    CHARLES S. HAIGHT, JR.
    Senior United States District Judge